IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 14, 2018

**STATE OF TENNESSEE v. HUGH EVERRET BURT**

**Appeal from the Criminal Court for Davidson County**
**No. 2016-B-634      Monte Watkins, Judge**

———————————————————————

**No. M2017-00547-CCA-R3-CD**

———————————————————————

After a bench trial, the trial court found the Defendant, Hugh Everret Burt, guilty of sexual exploitation of a minor for knowingly possessing less than fifty sexual images of minors. The trial court sentenced the Defendant to two years and six months, with six months to be served in jail and the remaining served through Community Corrections. On appeal, the Defendant argues that the evidence against him is insufficient and that the trial court erred when it ordered him to serve a portion of the sentence in jail. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Michael A. Colavecchio, Nashville, Tennessee, for the appellant, Hugh Everret Burt.

Herbert H. Slatery III, Attorney General and Reporter; Linda D. Kirklen, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Tammy H. Meade, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the discovery of sexual images of minors on the Defendant's computer. A Davidson County grand jury indicted the Defendant for sexual exploitation of a minor for possessing more than fifty sexual images of minors between December 12, 2012, and December 12, 2013. The State later amended the charge to reduce the number of images to less than fifty, a Class D felony. The Defendant waived his right to trial by a jury, and the case proceeded to a bench trial. At trial, the parties presented the following evidence:  David Carrigan, a Metropolitan Nashville Police Department

detective, testified that he worked in the Sex Crimes Unit and on the Internet Crimes Against Children Task Force.

Detective Carrigan described how he became involved in this case, saying that the National Center for Missing and Exploited Children ("NCMEC") was established by Congress to act as a clearinghouse for reports of possible child pornography or exploitation offenses from internet service providers, websites, and other internet-related entities. He used "Facebook, Microsoft, Google" as examples of entities that would report to NCMEC anything suspicious that they might find on their servers.

Detective Carrigan testified that, in this case, two reports were made to NCMEC based upon the same image being uploaded to the same Microsoft SkyDrive account, on the same day, but at two different times. The image is included in the record and depicts a young boy lying on a bed with a view of his exposed buttocks. Detective Carrigan estimated the child's age at thirteen to fourteen years old. This image, the IP address of the computer making the upload, the email addresses, and user name associated with the SkyDrive account were all provided to NCMEC. The IP address was linked to the Nashville area so NCMEC forwarded all of the information to Tennessee authorities for investigation.

Detective Carrigan testified that he contacted the service provider, Comcast, connected to the IP address and obtained information about the IP address. Detective Carrigan learned that the IP address was assigned to the Defendant and associated with an address on Priest Lake Drive. Detective Carrigan identified Comcast billing record and subscriber information, confirming that the IP address was associated with the Defendant. Detective Carrigan also confirmed that the Defendant's address was the same Priest Lake Drive address provided by Comcast. The Defendant's driver's license reflected the Priest Lake Drive address and the power and electric at that address were registered to the Defendant.

Detective Carrigan executed a search warrant on December 12, 2013, at the Priest Lake Drive address. The Defendant's wife answered the front door, and two officers spoke with her on the main floor while Detective Carrigan spoke with the Defendant downstairs in the basement. Detective Carrigan said that he noticed a laptop sitting near the front door where he entered the home. Once downstairs, Detective Carrigan explained to the Defendant that he had a search warrant and would be taking some items but that the Defendant was not "under any requirement to make a statement." The Defendant confirmed his understanding and then spoke with Detective Carrigan.

Detective Carrigan testified that the Defendant confirmed that he had a SkyDrive account. He provided Detective Carrigan with several email addresses, one of which was associated with the SkyDrive account (hughburtseventythree@msn.com). The Defendant also provided his password for the SkyDrive account and stated that he had purchased the computer new about a year before. He confirmed that he was the sole user of the computer and the SkyDrive account. The Defendant told Detective Carrigan that he had uploaded images to his SkyDrive account but denied any knowledge of child pornography on the account. He did, however, admit that on the computer, "there was some pornography and some other images, that he had got while he was a soldier."

Detective Carrigan testified that the Defendant acknowledged having searched for pornography using search terms, such as, "Young Girls," "Asian Women," and "Black Women," but denied any direct searches for child pornography. Detective Carrigan described for the Defendant the image that had been sent to him from NCMEC. The Defendant said he did not "recall" that particular image but stated that "he had uploaded other stuff as a batch, it coulda (sic) been in that." After "manual" searches of several electronic items in the residence, Detective Carrigan seized the Defendant's laptop, the external drive, and a thumb drive.

Chad Gish, a Metropolitan Nashville Police Department detective, testified that he was assigned to the Criminal Investigation Division in the Surveillance Investigative Support Unit. Detective Gish testified as an expert in Forensic Analysis and stated that he reviewed the contents of the Defendant's laptop computer. From the hard drive of the laptop computer, Detective Gish "obtain[ed] a forensic image" or duplicate copy of the information on the computer's hard drive. Detective Gish stated, about the Defendant's external hard drive, that he was unable to obtain a forensic image because the drive had some damage that would not allow him to access the information.

Detective Gish testified that as he searched the forensic image made from the laptop, he was unable to find any photographs that were saved on the hard drive and still active files. Detective Gish did find a program called CCleaner on the hard drive used to delete and overwrite files on a computer. He explained that even though a file was deleted it may still be accessed forensically until a new file overwrites it. Detective Gish found on the computer "a number of times" where CCleaner had been executed to overwrite data. Next, Detective Gish searched the remaining deleted information on the hard drive and recovered "thousands upon thousands of images," however, most were adult pornography.

Detective Gish testified that he reviewed all of the images and recovered fifty-eight to sixty that he believed were child pornography. The images depict young girls

- 3 -

exposing their breasts and genitalia and engaging in sexual acts or simulated sexual acts. Those images were sent to NCMEC to determine if there were any known child victims associated with the images. Detective Gish stated that, because of the nature of the recovered images, he was unable to determine the exact dates and times that the images were stored on the Defendant's computer.

Detective Gish testified that the next phase of his analysis was to search the internet history from the laptop to try to find from where the images came. Once again, everything had been deleted or "previously backed up, by an automated system in this computer." Detective Gish was able to find, however, search terms used on "Bing" to look for what appeared to be child pornography. Some of the search terms were "Little Girl's First Time," "Very Young School Girls," "Exploited Tiny, Young, Petite Teen," "Puberty Budding Breasts," and "Daddy Incest." Detective Gish could determine that these search terms were used but not the date and time of the searches.

On cross-examination Detective Gish testified that it is possible to transfer a file full of pictures from an external drive to a laptop's hard drive without looking at each individual picture. He confirmed that he decided which images were "suspect images" and sent them to NCMEC for verification. Of the fifty-six images, one image depicted a confirmed child victim.

The Defendant testified that on the day the search warrant was executed, he was asleep in the bedroom when his wife woke him up. The Defendant spoke with Detective Carrigan in the basement. The Defendant said that he told Detective Carrigan that he wanted to speak in his wife's presence but Detective Carrigan said it "wouldn't be a good idea." The Defendant confirmed he lived in the residence with his wife and step-daughter at the time and that the laptop computer was exclusively his. The Defendant explained that during the summer of 2013, however, he had been in Wisconsin with his eighteen-year-old son. He was in Wisconsin from May to July, and during this time, his son and his son's friends had access to his laptop.

The Defendant stated that he obtained the computer in April 2013 from Best Buy when his old computer was not repairable. Because his old computer was still under warranty, Best Buy replaced his old computer with a "floor demo."

The Defendant testified about his work history. He explained that he was working on a Navy contract with Honeywell but that he was "furloughed" when the contract was not renewed. While unemployed he set up the Microsoft account because he had several people contact him about "consulting work." He believed the Microsoft account would

- 4 -

allow him to access documents from his phone that were compatible with his computer should he begin doing consulting work.

The Defendant testified that he obtained the external hard drive in 2005. He said that, at the time, he was a contractor in Iraq for a little over two years. He purchased the external hard drive at an Air Force Post Exchange. He bought it for the purpose of downloading manuals to use while servicing military vehicles. The computer he used, however, was a community computer, and the external hard drive remained in the common area with the computer. Various people used the external hard drive for both work and for personal reasons. The Defendant left Iraq in 2006, and the hard drive went with him to Wisconsin to his parents' home. The Defendant still traveled a lot with his new work, but the external drive remained in his parents' home. In 2008, he bought a house in Nashville, and in 2010 the hard drive arrived in Nashville along with items he had stored at his parents' home. While in Nashville, he had two different girlfriends who would stay at the house while he was away.

The Defendant testified that, around the time he worked at Honeywell, he was in counseling to deal with post-traumatic stress disorder ("PTSD"). He knew photographs from Iraq were on the external drive so, as part of his therapy, he wanted to access those pictures. His external hard drive, however, would not work with his new computer, so he used his son's old laptop that had Windows XP to transfer the files. He transferred whole files without looking through the folders onto a memory stick and then "dropped them on my computer in a folder." He explained that it was a cumbersome process and took him almost five days to transfer the information to his new computer. He reiterated that he did not view what he was transferring; he was just trying to get the information off the external hard drive to sort through later. His motive though was to find the photographs from Iraq to help in addressing issues in counseling related to PTSD.

The Defendant testified about his childhood. He said he was one of three children and that his mother married a man with four sons. When they moved in together, only the youngest son, "Jimmy," was still living with his father. Jimmy forced the Defendant and the Defendant's brother to perform sexual acts on him. He raped the Defendant on one occasion but, during a second attempt, the Defendant fled into the streets for help and, ultimately, Jimmy was forced to leave the home. He was told "not [to] talk about it" because it was not "good for the family." The Defendant was later sexually assaulted by a family friend.

The Defendant explained that the search terms Detective Gish found related to "Incest" "Real Incest" and "Naughty Incest" were because he was reading about the effects of sexual abuse on men. He and his wife were entering counseling to work on

their marriage and for him to address issues from his past. In preparation for counseling, he said that he tried to find information related to boys and the impact of sexual assault but more often there was information on the abuse of women. He explained that in the course of searching for this information he would be directed to sites that were not what he was looking for, and he would "reject them" and look in other areas of the internet for information. He said that he was not looking for pornography but for a way to help himself.

The Defendant testified that he did enter the search terms related to incest, but he was unaware of the other search terms attributed to the searches on his computer. He reiterated that, often, as he searched he would be redirected to different websites that were not of his choosing. The Defendant denied putting any pornographic images on his computer and said that his son and his son's friends had access to his computer. He clarified that he was not saying they were the ones who had downloaded the photographs, he was merely pointing out that they had access to the computer. He further agreed that the images could have come from the external hard drive. As he reviewed some of the material that he had transferred, he deleted it because it contained nudity but not child pornography.

The Defendant testified that he "looked up" a "medical picture" of a teenager before and after puberty. He explained that he did so because he was raped at the age of eleven and had not gone through puberty yet. He said that he did this as a "medical thing." Defense counsel provided the Defendant with a copy of the images obtained from his computer. The Defendant denied having ever seen the photographs before or having downloaded the photographs onto his computer knowingly. He stated that he did not know who had downloaded the images onto his computer.

The Defendant testified that he purchased and installed the CCleaner program as a "malware program." He explained that he had received a warning on his computer that said, "Windows has detected a threat on your computer." In an effort to clean the computer, he installed the program. He said he was unaware that CCleaner was used to erase pornography. He said that he was concerned that all the information he had transferred from his external hard drive had contaminated the hard drive on his laptop computer.

The Defendant testified that he and his wife began counseling in early 2013 and continued counseling for "roughly" three months. The couple discontinued counseling when the Defendant was "laid off" from Honeywell. Defense Counsel showed the Defendant a photograph that was uploaded "to the cloud" in April 2013. The Defendant denied that he uploaded the photograph and stated that he had never seen the photograph

before. The Defendant stated that he only obtained the Microsoft account for work purposes to connect his phone and his computer. He never used the "portion" of "that program" that would upload photographs. He said that he had the Microsoft account for less than thirty days when it was shut off and that he did not have the chance to fully set up the account on his phone before this occurred. The Defendant confirmed that he understood that the account was closed after the photograph that appeared to be child pornography was uploaded twice in the same day.

The Defendant testified that Microsoft customer service representatives would not give him a specific reason why the account was closed and referred him to the service agreement. The Defendant believed that the account may have been terminated due to the photographs from Iraq that depicted military images related to fighting.

On cross-examination, the Defendant agreed that Detective Carrigan told the Defendant "more than once" that he did not have to speak with him. The Defendant agreed that he understood he could leave at any time and that Detective Carrigan never threatened him. The Defendant also agreed that he told Detective Carrigan that he had looked at pornography. He confirmed that he told Detective Carrigan that the search engine he used was Bing and that he used search terms like "Asia Women," "Black Women," and "Young Women." He agreed that he searched for pornography on the internet and that he looked at the images that appeared as a result of his search terms. He confirmed that he told Detective Carrigan that the computer was his and not used by his wife or step-daughter.

The Defendant testified that he searched under the term "Incest Nudist Family" to "find out how other people dealt with situations similar to [his]." He stated that "Naughty Incest," "Daddy Incest," and "Family Incest" were also searches to find legitimate therapeutic information about incest. He denied selecting images and stated that he was redirected to the images tab on Bing.

After hearing the evidence, the trial court found the Defendant guilty of sexual exploitation of a minor, under fifty images, a Class D felony. At a subsequent sentencing hearing, the trial court heard testimony from the Defendant's wife that he was a hard worker, a good husband, and a good step-father to her daughter. The Defendant made a statement in allocution maintaining his innocence but asking the trial court to consider his wife's testimony, and his service in the military. The trial court stated that it was considering the testimony at trial, which included testimony about the Defendant's military history and the Defendant's difficult childhood. The trial court also considered the nature of the offense and that the Defendant had no prior criminal record. The trial court found applicable Tennessee Code Annotated section 40-35-101(1)(b), that

confinement was necessary to avoid depreciating the seriousness of the offense in ordering an alternative sentence involving incarceration. The trial court ordered the Defendant to serve six months in jail followed by two years of probation. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant argues that the evidence against him is insufficient and that the trial court erred in ordering him to serve a portion of the sentence in jail.

## A. Sufficiency of the Evidence

The Defendant asserts that the evidence supporting his conviction is insufficient because the State failed to show that the Defendant knowingly obtained the images found on his laptop. The State responds that the evidence supports the Defendant's conviction for knowingly possessing less than fifty images depicting children engaging in sexual acts or simulated sexual acts. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App.

1990).  Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence.  *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)).  "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).  The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)).  This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence.  *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)).  Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict.  *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

It is a Class D felony for any person to "knowingly possess material that includes a minor engaged in . . . [s]exual activity; or . . . [s]imulated sexual activity that is patently offensive."  T.C.A. § 39-17-1003(a), (d).  "Material" includes any picture or photograph, image stored on a computer hard drive or transmitted to a computer even if not saved at the time of transmission.  T.C.A. § 39-17-1002.  The State is not required to prove the actual identity or age of the minor.  T.C.A. § 39-17-1003(e).

The evidence, viewed in the light most favorable to the State, showed that the Defendant possessed thousands of pornographic images.  Of those, at least fifty-eight to sixty were images depicting children.  The Defendant confirmed his exclusive ownership of the computer and his Microsoft SkyDrive account.  It was from this SkyDrive account that an image of an approximately thirteen year old boy lying on a bed with his exposed

- 9 -

buttocks was uploaded. The Defendant confirmed that the email account address reported by NCMEC to Tennessee authorities, hughburt73@msn.com belonged to him. The Defendant admitted to Detective Carrigan that he searched for and viewed adult pornography on the computer. The additional images recovered by Detective Gish included images of young girls exposing their breasts and genitalia and engaging in sexual acts or simulated sexual acts. Some of the search terms used on the Defendant's computer were: "Little Girl's First Time," "Very Young School Girls," "Exploited Tiny, Young, Petite Teen," "Puberty Budding Breasts," and "Daddy Incest." The Defendant offered varying theories on why the images were on his computer; however, the trier of fact resolves all questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence. By its verdict, the trial court did not credit the Defendant's versions of why the images were on his computer.

Accordingly, we conclude that, based upon this evidence, a rational trier of fact could conclude that the Defendant knowingly possessed up to fifty images of a minor engaged in sexual activity or simulated sexual activity that is patently offensive. Therefore, the Defendant is not entitled to relief as to this issue.

## B. Sentence

The Defendant asserts that the trial court erred when it sentenced him to six months incarceration. The State responds that the trial court applied the principles of the Sentencing Act and stated its reasons for imposing jail time as part of the sentence, therefore, the trial court properly exercised its discretion in imposing an alternative sentence involving incarceration. We agree with the State.

In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" 380 S.W.3d 682, 708 (2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*.; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in

compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id*. at 707.

Our Supreme Court extended the *Bise* standard to appellate review of the manner of service of the sentence. The Court explicitly held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). We are also to recognize that the defendant bears the burden of demonstrating that the sentence is improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2014).

With regard to alternative sentencing, Tennessee Code Annotated section 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration.

A defendant who does not fall within this class of offenders, "and who is an especially mitigated offender or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of

evidence to the contrary." T.C.A. § 40-35-102(6). Additionally, we note that a trial court is "not bound" by the advisory sentencing guidelines; rather, it "shall consider" them. T.C.A. § 40-35-102(6) (emphasis added).

Even if a defendant is a favorable candidate for alternative sentencing under Tennessee Code Annotated section 40-35-102(6), a trial court may deny an alternative sentence because:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103.

After review, we conclude that the trial court properly applied the principles of sentencing when it ordered a within-range sentence of six months in jail before release to serve two years in Community Corrections. The sentencing range for a Class D felony for a Range I offender is two to four years. In imposing the sentence, the trial court considered the Defendant's trial testimony regarding his military service and childhood abuse. The trial court also noted that the Defendant had no prior criminal record. It also considered the Defendant's candor with the court in regard to his role in the offense and the nature of the offense. Finally, the trial court found "[c]onfinement [ ] necessary to avoid depreciating the serious of the offense" and that "confinement was particularly suited to provide an effective deterrence to others likely to commit similar offenses." T.C.A. § 40-35-103(b).

Accordingly, we conclude that the trial court clearly stated its reasons for the sentence imposed, and the Defendant's sentence is within the appropriate negotiated range. It is apparent that the trial court considered the purposes and principles of the Sentencing Act and did not abuse its discretion. The Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE